[No. B141916. Second Dist., Div. Four. Mar. 23, 2001.]

GORDON ECKER, Plaintiff and Appellant, v.
RAGING WATERS GROUP, INC., Defendant and Respondent.

**COUNSEL**

Clark & Trevithick, Philip W. Bartenetti and Judith Ilene Bloom for Plaintiff and Appellant.

Higgs, Fletcher & Mack, Steven J. Cologne and Dianne M. Schweiner for Defendant and Respondent.

**OPINION**

**VOGEL (C. S.), P. J.—**

### INTRODUCTION

This appeal arises out of the following series of events.

Gordon Ecker went to Raging Waters amusement park. Several adolescent boys complained to park security that Ecker was following and videotaping them. Security observed Ecker and confirmed he was surreptitiously videotaping juveniles. After uniformed security personnel approached Ecker, he

went with them to their office. While he was there, a Raging Waters security officer, without Ecker's knowledge or consent, took the videotape from his camera and viewed it. The videotape consisted exclusively of shots of the bodies of adolescent boys. Raging Waters security contacted law enforcement. Los Angeles County deputy sheriffs arrived and took Ecker into custody for the misdemeanor offense of annoying or molesting a child under the age of 18, a violation of Penal Code section 647.6, subdivision (a). Ecker had been detained for three hours by Raging Waters security without being told of the nature of the complaint or being questioned about his actions.

The district attorney filed a misdemeanor charge (Pen. Code, § 647.6, subd. (a)) against Ecker. A jury returned a verdict of "not guilty."

Ecker then sued Raging Waters for malicious prosecution, false imprisonment, negligent infliction of emotional distress, and negligent supervision and/or hiring of its employees.

The trial court conducted a hearing to determine whether Raging Waters had probable cause to initiate or procure Ecker's arrest. The court found probable cause existed as a matter of law and therefore granted nonsuit to Raging Waters on the malicious prosecution cause of action. We affirm that ruling.

In regard to the remaining three causes of action, Raging Waters relied upon the defense provided by Penal Code section 490.6 (hereafter section 490.6). That statute provides, in pertinent part, that in any civil action based upon a detention or arrest by an amusement park employee, it shall be a defense "that the amusement park employee . . . had probable cause to believe that the person was not following lawful amusement park rules and that the amusement park employee acted reasonably under all the circumstances." (§ 490.6, subd. (c).) Based upon this statute, the trial court granted nonsuit to Raging Waters on Ecker's three other claims. The court believed undisputed facts established Raging Waters personnel had probable cause and acted reasonably. We reverse this portion of the ruling. Utilizing the appropriate standard to review a grant of nonsuit, we conclude the court's finding that Raging Waters security personnel acted reasonably as a matter of law is not supported by the record.

## FACTUAL AND PROCEDURAL BACKGROUND

The issues were tried to the court in a pretrial hearing. One of the boys who had complained (Jeremy G.) testified and the court, over Ecker's objection, viewed the videotape. In addition, the parties submitted a statement of stipulated facts, deposition testimony of one security guard (Clayton

Stelter), a declaration from another security guard (Manuel Iniguez), a declaration from Ecker, and a copy of the Raging Waters security manual. This evidence established the following events.

Ecker held a season pass to Raging Waters. Prior to the day in question, he had visited the park several times in 1998. On June 13, 1998, he went to the park by himself. He brought and used a videocamera as he had in the past. Raging Waters has no policy against videotaping in the park.

Four adolescent brothers were visiting the park together. On several occasions, they saw Ecker with a videocamera. The boys never saw Ecker, who was alone, go on any of the rides but instead "always [saw him] at the end of the rides." One of the boys, Jeremy G., testified: "[I]t looked like he [Ecker] was videotaping, but he never had the camera up at his side. He always had it down at his side. When someone would be going down [a ride], he would have his camera hang with him and moved his body and followed them with the camera . . . ." This seemed "really weird" to the boys so they would go to a different ride if they saw Ecker. Because the boys had seen Ecker "a couple of times before doing the same thing" and it "really bother[ed]" them, they went to the park security.

They spoke to park security "for about 15, 20 minutes." They told security all of the foregoing, including the fact that during that day Ecker had filmed them "maybe an hour, hour and a half." They explained that Ecker's filming "bothered so bad because we had to keep going different ways, and we felt like we had to move away. We felt like we wanted to beat him up, but we didn't. That's how bad it bothered us. This guy is really doing something wrong to us."

When asked how they knew Ecker was filming them, "[o]ne of the elder boys indicated that he had sent his younger brother to the top of the waterslides, and observed [Ecker's] actions. . . . [T]he actions of his brother sliding down the slide and the actions of [Ecker] coincided. As his younger brother slid down the waterslide, [Ecker] pointed his camera directly at his younger brother. [Ecker's] camera remained pointed at the younger brother as the brother exited the bottom of the slides. As the younger brother walked past [Ecker], exiting the waterslide, [Ecker] continued to point his camera at the younger brother . . . ." The boys had dubbed Ecker "the Stalker" because they had previously seen him film others in the park. Manuel Iniguez, the security guard who first interviewed them, opined that "[t]he boys appeared quite disturbed and upset by [Ecker's] actions."

Clayton Stelter, Raging Waters' security supervisor, was informed of the above and went to look for Ecker. Stelter observed Ecker with his "videocamera underneath his arm. And it appeared that he was walking along and

would either follow certain juveniles or would, as they pass, turn and pan with the camera and follow them with the camera." He also saw him "rest[ing] the camera on [an] arm rail [of rope bridges], videotaping the kids coming across the ropes . . . ." These observations took "10 to 20 minutes" after which Stelter concluded they "had a valid complaint" but "didn't know really legally what [they] had . . . ." Stelter and two other guards approached Ecker, identified themselves as security officers, told him they "had a complaint, and . . . asked if he could help [them] resolve it." They neither touched him nor took his videocamera. According to Stelter, Ecker agreed to go to the security office, although Ecker's declaration, which will be set forth later, averred he felt he had no choice. Stelter testified that if Ecker had not agreed to accompany them, they would have let him go because they "are not allowed to detain anyone . . . ." Stelter conceded he and the other guards did not discuss the option of giving Ecker a warning rather than asking him to come with them; that he did not ask Ecker to stop filming because he "wasn't sure that we had anything in reference to any criminal matter or any—if the kids had a valid complaint at all"; and that there was no particular reason they could not have attempted to resolve the complaint on the spot as opposed to in the security office. It was stipulated that security had no information that Ecker had spoken with or touched any minor that day.

At the security office, Ecker was told to leave his belongings, including the videocamera, in the lobby and to have a seat in the office. Ecker complied. At some later point, Stelter, without Ecker's knowledge or permission, took the videotape from the camera, left the office, and viewed a portion of it in another office. The portion he saw "was focusing on chubby male juveniles from the neck down." Stelter did not question Ecker about what he had seen on the videotape.

The Raging Waters security manual explains that the "primary concern" of its security department is "[p]revention and reaction to incidents that are undesirable to our guests . . . ." Security enforces park rules and regulations but "[a]ctual enforcement of laws" is the responsibility of law enforcement, "with Raging Waters Security personnel assisting as needed." The manual defines various crimes. Disturbing the peace includes "creating a disturbance that offends others." The manual authorizes immediate detainment of a suspect in the case of serious felonies and "where the immediate detainment of the suspect is necessary to secure the safety of the park guests and surrounding community." The manual also provides: "Some of the minor crimes and rule infractions can be handled by counseling and following one of the disposition [release] options." Stelter testified he did not follow the latter option with Ecker because "the conduct involved juveniles

and to protect . . . Raging Waters and ourselves personally [the security guards], if we did have a felony that was committed in our presence and we didn't do anything to assist the victims or anything like that, then we would be held liable . . . ."

Because the security personnel were unsure which, if any, crime Ecker had committed, they called the Los Angeles County Sheriff's Department. While they were waiting for the deputies to arrive, Ecker asked "how long is this going to take . . . ." Stelter told him they "were working on it. If he could hang on for a second for us, we were trying to figure out or take care of the problem . . . ."

The deputy sheriffs took Ecker into custody for the misdemeanor offense of annoying or molesting a child under the age of 18 (Pen. Code, § 647.6, subd. (a)).[1] Thereafter, the district attorney elected to prosecute him for that crime. The jury returned a "not guilty" verdict.

Ecker submitted a declaration about the events in the park. In pertinent part, he averred:

"6. . . . I was approached by . . . Clayton Stelter . . . . He said words to the effect, 'You need to come with me.' He did not tell me I had violated any Park rules or that I was suspected of violating any Park rules. When he first approached me, he did not ask me any questions about my activities in the Park.

"7. I was escorted to the Park security office by Stelter and two other uniformed Park guards. At no time did Stelter tell me I did not have to go to the security office with him. It was clear from Stelter's language and demeanor that I was required to go with him and that I was not free to leave. Certainly, at no time from the time I was approached by Stelter, until I was taken from the Park by a representative of the . . . Sheriff's Department . . . , did I feel free to leave either the custody of Stelter or the Park security office.

"8. I was held at the Park security office for what I believe was in excess of three hours. After approximately an hour and a half, a representative of the Sheriff's Department arrived and appeared to take custody of me. Prior to the arrival of the Sheriff's Department representative, I was not questioned by anyone concerning any of my activities in the Park. I was not told why I was being held in the security office.

---

[1]The trial court's statement of decision incorrectly recites the offense as a violation of Penal Code section 647, subdivision (a), lewd conduct.

"9. When I first arrived at the security office, Stelter, without my permission, took my recording equipment and placed it in an office cubicle out of my sight. Neither Stelter nor either of the other two officers who took me to the security office asked me any questions concerning my activities in the Park[2] or gave me any reason for their taking me to the security office. The only questions I was asked while in the security office, prior to the arrival of the Sheriff's Department representative, were vital statistics such as Social Security number, home and work address, whether I had a season pass and related identification type questions. . . .

"10. During the entire first hour and a half that I was held in the security office, I was in what appeared to me to be the reception area. I had been directed by Stelter to sit in a chair in that reception area. I was dressed only in swim trunks, tank top and sandals. The office was air conditioned. It was cold to the point of being uncomfortable. I did complain of the cold and, on a number of occasions, asked what the problem was, or what was going on. On each occasion I was not given any specifics, only words to the effect, 'Don't worry, it won't be long.' At no time was I told by Park personnel that I was free to leave and, in fact, I was led to believe the exact opposite; that is, that I must stay in the security office until the Park personnel completed whatever undisclosed activities in which they were engaged.

"11. At no time during my visit to the Park on June 13 . . . did anyone ask me [to] stop recording, . . . did anyone tell me that my recording was disturbing them or any other person in the Park."

The trial court granted nonsuit on the malicious prosecution action, finding probable cause existed as a matter of law. It also granted nonsuit on Ecker's three other causes of action, finding that the defense provided by section 490.6 applied as a matter of law.

This appeal by Ecker follows.

DISCUSSION

A. *The Trial Court Properly Admitted into Evidence and Considered the Videotape Taken from Ecker*

■ Ecker unsuccessfully objected to the admission into evidence of the videotape taken by Stelter. Because both Raging Waters and the trial court

---

[2]In his appellate briefs, Ecker claims that he "was trying to cure himself of an irrational fear of water by forcing himself to visit the park and by taking pictures and sounds of people enjoying the water park so he could hear them at home, all in an effort to desensitize himself to his fear of the water." This claim was not included in the detailed four-page declaration Ecker presented to the trial court. We therefore cannot and do not consider it in evaluating his appellate contentions.

considered the videotape in making their respective decisions, we first address Ecker's arguments directed to that point.

A subtext of Ecker's appellate briefs is the claim that Raging Waters' action of seizing and viewing without his consent his videotape was unreasonable, thereby rendering impermissible consideration of the videotape by either Raging Waters or the trial court. Not surprisingly, Ecker cites no authority for this novel proposition. There is none. "The rule of inadmissibility [of evidence illegally seized by the police] was developed in criminal cases for the primary purpose of deterring unlawful activity by law enforcement officers . . . ; hence, the rule cannot be invoked in civil proceedings. [Citations.]" (4 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Illegally Obtained Evidence, § 14, p. 626.) That is, there is no exclusionary rule which bars Raging Waters from introducing the videotape into evidence in this lawsuit to establish probable cause even were one to find the actions of its employees unreasonable, a finding we do not make. (But see Comment, *The California Constitutional Right of Privacy and Exclusion of Evidence in Civil Proceedings* (1978) 6 Pepperdine L.Rev. 231 [advocating adoption of an exclusionary rule in civil cases to deter invasions of privacy by private individuals].) Consequently, there was no legal impediment to the trial court's consideration of a videotape seized by a private citizen.[3] And contrary to what Ecker urges, the videotape was, as we will explain, relevant to determining the existence of probable cause because it was one of the facts Raging Waters considered in taking its action of contacting law enforcement. In sum, the trial court properly admitted the videotape into evidence.

To a large extent, Ecker's real complaint is that Raging Waters' nonconsensual seizure and viewing of the videotape were unreasonable conduct, unauthorized by law. That issue will be addressed when we discuss section 490.6 and the trial court's grant of nonsuit based upon that statute.

### B. The Trial Court Properly Granted Nonsuit on the Malicious Prosecution Cause of Action

"Unjustifiable criminal litigation, causing damage to reputation and the expense of defending proceedings, gives rise to the tort of malicious prosecution, which consists of initiating or procuring the arrest and prosecution of another under lawful process, but from malicious motives and without probable cause. [Citations.] [¶] One who procures a third person to

---

[3]Even in a criminal prosecution, the action of a private security guard in searching an individual is not subject to the proscriptions of the Fourth Amendment unless the private security guard "may fairly be said to be a state actor." (*People v. Taylor* (1990) 222 Cal.App.3d 612, 621 [271 Cal.Rptr. 785].) In this civil lawsuit, Ecker has never argued Raging Waters security personnel were state actors.

institute a malicious prosecution is liable, just as if he instituted it himself. The test is whether the defendant was actively instrumental in causing the prosecution.[4] [Citations.]" (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 418, p. 503, italics omitted.)

▉▉▉ Ecker sued for malicious prosecution based upon the claim that Raging Waters, without probable cause and, with malice, caused a criminal prosecution to be initiated against him which terminated in his favor through a "not guilty" verdict. In the trial court, the *only issue* litigated and decided in regard to this tort was whether Raging Waters had acted with probable cause. We therefore confine our discussion to that element.

▉▉▉ In *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863 [254 Cal.Rptr. 336, 765 P.2d 498] (*Sheldon Appel*), our Supreme Court clarified that "the probable cause element calls on the trial court to make an objective determination of the 'reasonableness' of the defendant's conduct, i.e., to determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable. The resolution of that question of law calls for the application of an *objective* standard to the facts on which the defendant acted. [Citation.] Because the malicious prosecution tort is intended to protect an individual's interest 'in freedom from unjustifiable and unreasonable litigation' [citation], if the trial court determines that the prior action was objectively reasonable, the plaintiff [e.g., Ecker] has failed to meet the threshold requirement of demonstrating an absence of probable cause and the defendant [e.g., Raging Waters] is entitled to prevail." (*Id.* at p. 878.) When the facts known by the defendant are not in dispute, "the probable cause issue is properly determined by the trial court under an objective standard . . . ." (*Id.* at p. 881.)

▉▉▉ When, as here, the claim of malicious prosecution is based upon initiation of a criminal prosecution, the question of probable cause is whether it was objectively reasonable for the defendant (Raging Waters) to suspect the plaintiff (Ecker) had committed a crime. (See *Sheldon Appel, supra,* 47 Cal.3d at p. 885; *Cummings v. Fire Ins. Exchange* (1988) 202 Cal.App.3d 1407, 1420-1421 [249 Cal.Rptr. 568]; and *Williams v. Coombs* (1986) 179 Cal.App.3d 626, 634 [224 Cal.Rptr. 865]; see also *Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 499 [78 Cal.Rptr.2d 142] ["[I]n California, the commission of the tort of malicious prosecution requires a showing of an unsuccessful prosecution of a criminal or civil action,

---

[4]"Cases dealing with actions for malicious prosecution against private persons require that the defendant has at least sought out the police or prosecutorial authorities and falsely reported facts to them indicating that plaintiff has committed a crime." (*Sullivan v. County of Los Angeles* (1974) 12 Cal.3d 710, 720 [117 Cal.Rptr. 241, 527 P.2d 865].)

which any reasonable attorney would regard as totally and completely without merit [citation], for the intentionally wrongful purpose of injuring another person."].)

In this case, the facts regarding the existence of probable cause fall into three categories: (1) the complaints made by the boys to Raging Waters security; (2) security's subsequent observations of Ecker; and (3) the videotape. None of these facts were disputed. Ecker's argument to the contrary is unavailing. He does not point to any evidence which contradicts these facts, but merely argues Raging Waters security did not conduct a sufficient investigation or that Raging Waters security could have handled the matter differently than it did. That argument misses the mark. Whether the malicious prosecution defendant conducted a sufficient or adequate investigation is legally irrelevant to the probable cause determination. (*Sheldon Appel, supra,* 47 Cal.3d at pp. 882-883; see also *Richter v. Neilson* (1936) 11 Cal.App.2d 503, 515 [54 P.2d 54].) Instead, Ecker's argument addresses a separate issue: whether Raging Waters' actions were reasonable under all of the circumstances, an issue we will analyze later when we discuss the applicability of section 490.6.

Because the state of Raging Waters' factual knowledge was undisputed, it was for the court to decide whether such facts constituted probable cause. (*Sheldon Appel, supra,* 47 Cal.3d at p. 881.) That undisputed evidence established the following. Several adolescent boys complained that Ecker, whom they never saw use any of the park rides, had been following and videotaping them in a surreptitious manner. On prior visits to the park, the boys had seen Ecker film others and consequently referred to him as "the Stalker." To confirm their suspicions, one of the older boys watched Ecker as his younger brother used one of the waterslides. He saw Ecker point his camera in the direction of his younger brother as he slid down the slide, exited the slide, and walked away. In explaining these events to security, the boys were visibly upset and disturbed. After Stelter was informed of the foregoing, he watched Ecker for 15 to 20 minutes. His observations confirmed the complaints: Ecker, while holding his camera at his side, was actually videotaping juveniles. Stelter and two other guards approached and asked Ecker to come to the security office. Later, Stelter viewed the videotape and saw it consisted solely of shots of the bodies of adolescent boys.[5] At that point, law enforcement was called. Based upon all of these circumstances, it was objectively reasonable to suspect that Ecker's actions of following male juveniles and videotaping their bodies in a secretive manner—actions which clearly disturbed and upset the boys who had complained—were criminal.

---

[5]Pursuant to our request, Raging Waters has forwarded the videotape to this court. We have viewed it.

Ecker's argument to the contrary is not persuasive. He places great reliance on Stelter's testimony that he (Stelter) was not sure which park rule had been violated or which law, if any, Ecker had broken. That fact does not have the legal significance attached to it by Ecker.

■ When a party is sued for malicious prosecution based upon the initiation of earlier (unsuccessful) civil litigation, decisional law makes clear the party's subjective belief "in the claim asserted is irrelevant to the existence of probable cause. Instead, the proper inquiry in resolving the question of probable cause is to determine whether the prior action was *objectively* reasonable. If the trial court determines that it was, the malicious prosecution plaintiff has failed to meet the threshold requirement of demonstrating an absence of probable cause, and the defendant is entitled to prevail. [Citations.]" (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 167 [80 Cal.Rptr.2d 66], fn. omitted.) "[U]nder the standard adopted in *Sheldon Appel*, the factor of a 'reasonable' or 'honest' belief in the claim asserted is no longer relevant to, nor a part of, the court's determination as to the existence of probable cause." (*Downey Venture v. LMI Ins. Co., supra,* 66 Cal.App.4th at p. 498.)

■ By a parity of reasoning, the fact Stelter (and other Raging Waters personnel) was uncertain of the precise crime Ecker may have committed is irrelevant to the determination of probable cause. The issue is whether it was objectively reasonable to suspect Ecker had committed a crime. It was. Determination of the crime(s) to be charged is authority properly vested in a prosecuting agency, not a private amusement park such as Raging Waters.

In sum, based upon the undisputed facts, the trial court properly determined it was objectively reasonable to suspect Ecker had committed a crime, thereby establishing probable cause. This negated an essential element of Ecker's claim for malicious prosecution: lack of probable cause. The trial court therefore correctly granted nonsuit on the malicious prosecution claim.[6] (See *Hamilton v. City of San Diego* (1990) 217 Cal.App.3d 838, 847 [266 Cal.Rptr. 215] [nonsuit proper in action for false arrest when undisputed evidence established probable cause].)

---

[6]Ecker's argument that "[t]he trial court ruled on a nonsuit motion that defendant [Raging Waters] did not make" is directly contradicted by the record. At the end of the hearing, the court asked the parties: "So am I to take it right now that it is correct that the court should in its ruling make that probable cause determination, make a determination whether [Penal Code section] 490.6 provides a defense and indeed grant or deny a motion for nonsuit as to all or some of the causes of action?" Counsel for both parties responded in the affirmative.

### C. *The Trial Court Erred in Granting Nonsuit on Ecker's Three Other Causes of Action*

As stated earlier, in addition to suing for malicious prosecution, Ecker also sued Raging Waters for false imprisonment, negligent infliction of emotional distress, and negligent training and/or supervision of its employees. The trial court granted nonsuit on those claims, finding the defense created by section 490.6 applied as a matter of law. We reverse because viewing the evidence in the light most favorable to Ecker—the standard we must apply because this appeal follows the grant of a nonsuit[7]—the evidence does not support the conclusion that as a matter of law Raging Waters security personnel acted reasonably under all of the circumstances.

Before analyzing the merits of Ecker's contention, we must first address Raging Waters' argument that Ecker is precluded from raising this point on appeal. Raging Waters claims Ecker agreed that the trial court's determination on the issue of probable cause would be dispositive of all of his causes of action so that he may not now claim the other prong of the statute (employees acted reasonably) was not satisfied. The record does not support Raging Waters' claim.

At the close of the hearing, the court asked the parties what the focus of its ruling should be. After some discussion, counsel for both parties agreed with the trial judge's statement that he would "make that probable cause determination, *make a determination whether [Penal Code section] 490.6 provides a defense* and indeed grant or deny a motion for nonsuit as to all or some of the causes of action." (Italics added.) The court's detailed 10-page ruling contains numerous findings in regard to the issue of whether Raging Waters security personnel acted reasonably.[8] We therefore conclude the issue of whether Raging Waters acted reasonably within the meaning of subdivision (c) of section 490.6 was litigated and decided below and consequently has been preserved for appellate review.

---

[7]See, e.g., *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].

[8]For instance, the ruling finds: "A reasonable person would do exactly what was done by Park security. That is, request [Ecker] to come with them to the security office and conduct a further investigation. [Ecker] was not 'arrested.' [Ecker] was 'detained' and was able to leave at any time. [¶] A reasonable person would also attempt to view the videotape to determine what [Ecker] was doing. . . . [¶] An objectively reasonable person, with knowledge of the facts known to [Raging Waters's] security personnel at the time, would have asked [Ecker] to accompany them to a security office, would have viewed the video tape, and would have called and notified the appropriate law enforcement personnel. . . . [¶] . . . [¶] Based on the undisputed, above stated facts . . . the employees of [Raging Waters] amusement park acted reasonably under all the circumstances. [¶] . . . [¶] The provisions of Penal Code section 490, subd. (c) have been met. Those provisions provide a complete defense for the three remaining causes of action alleged against [Raging Waters]."

Section 490.6 provides:

"(a) A person employed by an amusement park may detain a person for a reasonable time for the purpose of conducting an investigation in a reasonable manner whenever the person employed by the amusement park has probable cause to believe the person to be detained is violating lawful amusement park rules.

"(b) If any person admitted to an amusement park refuses or fails to follow lawful amusement park rules, after being so informed, then an amusement park employee may request that the person either comply or leave the premises. If the person refuses to leave the premises or comply with lawful park rules, then the person shall be deemed to be intentionally interfering with and obstructing those attempting to carry on a lawful business within the meaning of [Penal Code] Section 602.1.

"(c) In any civil action brought by any person resulting from a detention or an arrest by a person employed by an amusement park, *it shall be a defense to that action that the amusement park employee detaining or arresting the person had probable cause to believe that the person was not following lawful amusement park rules* **and that the amusement park employee acted reasonably under all the circumstances**." (§ 490.6, italics and boldface added.)

Raging Waters first urges: "There is no separate requirement under Penal Code section 490.6 for the trial court to find 'reasonable actions.' " That is, Raging Waters claims the statutory requirement that security personnel act reasonably under all of the circumstances merely restates the requirement that they act with probable cause. From that premise, Raging Waters argues the trial court's finding that they acted with probable cause is also a finding its security personnel acted reasonably.

■ In construing subdivision (c) of section 490.6, we must ascertain the Legislature's intent. To determine that intent, "we first consult the words themselves, giving them their usual and ordinary meaning. [Citations.] When ' "statutory language is . . . clear and unambiguous there is no need for construction, and courts should not indulge in it." ' [Citations.]" (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) ■ The two elements of the defense set forth in subdivision (c) are connected by the word "and." The word "and" clearly " 'expresses the relation of addition or connection, and signifies that something is to follow in addition to that which precedes.' " (*Estate of Harker* (1948) 88 Cal.App.2d 6, 10 [198 P.2d 51]; accord, Black's Law Dict. (6th ed. 1990) p. 86 [defining

"and" as "[a] conjunction connecting words or phrases expressing the idea that the latter is to be added to or taken along with the first. Added to; together with; joined with; as well as; including."].) In other words, the Legislature's clear and unambiguous intent is that for a defendant to prevail upon this defense, the defendant must show *both* probable cause and reasonable actions under all the circumstances.

We now turn to the merits of the trial court's ruling.

As set forth in our earlier discussion, the first element of probable cause was established as a matter of law. Because lawful amusement park rules necessarily include obedience to the proscriptions found in the Penal Code, the security personnel had, as a matter of law, probable cause to believe Ecker was "not following lawful amusement park rules." (§ 490.6, subd. (c).)

It is in regard to the second element—park personnel acted reasonably under all of the circumstances—that the trial court erred in granting nonsuit. The standard of review is well settled. The trial court's ruling " ' " 'cannot be sustained unless interpreting the evidence most favorable to [Ecker's] case and most strongly against [Raging Waters] and resolving all presumptions, inferences and doubts in favor of [Ecker] a judgment for [Raging Waters] is required as a matter of law.' " ' [Citation.]" (*Alpert v. Villa Romano Homeowners Assn.* (2000) 81 Cal.App.4th 1320, 1327 [96 Cal.Rptr.2d 364], fn. omitted.)

Applying that principle to the record submitted to the trial court, Raging Waters was not entitled to a finding as a matter of law that its security personnel acted reasonably under all of the circumstances. For one thing, Ecker's uncontradicted declaration established he was held for at least three hours in a physically uncomfortable surrounding in which he was never asked one question about his actions. For another thing, Stelter conceded that without Ecker's permission or knowledge, he took the videotape from the camera and viewed it. In addition, when security first approached Ecker, they did not explain the complaint to him and did not seek an explanation from him for his actions. Ecker's declaration disputed Stelter's claim he agreed to go to the security office; Ecker asserted that when approached by the three uniformed security officers, "[i]t was clear . . . [he] was required to go . . . and . . . was not free to leave." Although Raging Waters security had the options of simply asking Ecker either to stop videotaping or to leave the park, they pursued neither one. In sum, whether Raging Waters security personnel acted reasonably under all of the circumstances is a disputed factual issue which should not have been resolved by granting nonsuit to

Raging Waters. We express no opinion as to how the issue should be ultimately decided but simply find nonsuit was an improper vehicle by which to resolve it.

### DISPOSITION

The judgment is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion. Appellant Gordon Ecker is to recover his costs on appeal.

Epstein, J., and Hastings, J., concurred.